# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                 Case No. 05-CR-280

GERALD T. SMITH,

        Defendant.

## ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL NOTWITHSTANDING THE VERDICT

On July 7, 2006, a jury returned a verdict finding defendant Gerald T. Smith guilty of involuntary manslaughter, contrary to 18 U.S.C. § 1112, in connection with the death of Diane Tucker-Turney. After the verdict was returned, the defendant moved for judgment of acquittal notwithstanding the verdict pursuant to Rule 29 of the Federal Rules of Criminal Procedure. Fed. R. Crim. P. 29(c). I summarily denied the motion at that time and granted the government's motion for judgment on the verdict. Given the evidence in the case, however, I conclude that the defendant's motion deserved further explanation. Thus, this order.

A motion for judgment of acquittal notwithstanding the verdict raises the issue of whether the evidence is sufficient to sustain the conviction. In deciding such a motion, the court must view the evidence in the light most favorable to the government and defer to the credibility determinations made by the jury. *United States v. Jackson*, 177 F.3d 628, 630 (7th Cir.1999). The trial court can overturn a verdict "only when the record contains no evidence, regardless of how it

is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Gougis*, 408 F.3d 735, 744 (7th Cir. 2005) (internal quotations omitted). Given this degree of deference owed jury determinations, the Seventh Circuit has described the defendant's challenge to the sufficiency of the evidence to support a verdict as "a nearly insurmountable hurdle." *Id.* While I view the defendant's motion for acquittal a closer question in this case than in most, I nevertheless conclude that it should be denied.

Tucker-Turney died from a severed spinal cord when she was thrown from the car in which she and Smith had been riding when it skidded off the highway on the Menominee Indian Reservation and rolled over. The accident occurred shortly before 7:00 p.m. on August 2, 2004. Both the defendant and Tucker-Turney were severely intoxicated at the time of the accident, and the primary issue in the case was who was driving. Neither was wearing a seatbelt. Both the driver's and passenger's side windows were open, and the car came to rest on its roof with the defendant in the back seat area.

There were no eye-witnesses to the accident, although several witnesses, including three persons from a car that had passed them moments before the crash, testified. Kevine Miller testified that she had seen the defendant and Tucker-Turney at her mother's store in Keshena between 4:30 and 5:00 p.m., and again forty to forty-five minutes later when she passed them on the highway. On both occasions, Miller testified that the defendant was in the driver's seat. However, Eva Wilbur, an elderly woman who knew the defendant since he was a child, testified that when she saw the vehicle around the same time, the defendant was in the passenger seat. In addition, two of the persons who were riding in the car that passed them just before the accident, Jake Roulliard and Kimberly Waukechon, testified that a woman was driving. Waukechon, who knew both the

2

defendant and Tucker-Turney, specifically identified Tucker-Turney as the driver. A third passenger in the passing car, Myron Wayka, testified inconsistently, identifying the defendant as the driver on direct examination and Tucker-Turney as the driver on cross-examination. He apparently identified Tucker-Turney as the driver before the grand jury, but had since given contradictory out-of-court statements concerning who was driving.

The government suggested that Waukechon, who had been friends with the defendant's deceased daughter, was lying to help him avoid responsibility out of sympathy for him. In addition to his daughter, the defendant also lost his wife to a previous motor vehicle accident, and a son had committed suicide. In the government's view, Waukechon belatedly came forward and tried to get her friends to do the same when she found out the defendant was charged. In the government's view, this was also why Wayka had given inconsistent accounts. He felt "torn" between loyalty to his friends and the truth, and did not want to testify.

Several persons who came on the scene immediately after the accident also testified. When Justin Wilbur arrived, the wheels on the overturned car may have been still turning. Wilbur testified that he helped the defendant exit through the driver's side window and observed him break down and cry when he saw Tucker-Turney. Ralph Boettcher, then an off-duty Menominee Tribal Officer, testified that the defendant appeared distraught and upset. According to Boettcher, the defendant said "I did it; I killed her." James Waukau, on the other hand, a truck driver who came on the scene with his son, testified that when the defendant was asked where Tucker-Turney was, he responded "she's in the car; she was driving." When instead her body was found some fifty-five feet beyond where the vehicle had come to rest, Waukau testified he became distraught and cried out. Finally, Menominee Tribal Police Officer Richard Irving and Menominee County Sheriff Deputy Louis

Moses both testified that when they asked the defendant who was driving, he looked down at Tucker-Turney's body, paused several seconds and said, "she was." When told he would be placed under arrest, the defendant responded, "do what you gotta do." Later, while at the Shawano Medical Center for treatment of his injuries, the defendant, who was at one time a Menominee Tribal Officer, said, "I was trained to kill, but not like this." He also gave several inconsistent or implausible descriptions of what happened to family members that came to see him at the hospital.

Both sides also presented testimony from accident reconstruction experts who had analyzed the evidence and offered their expert opinions as to who was driving the vehicle at the time it left the road. Trooper Larry L. Sparling from the Wisconsin State Patrol had actually gone to the accident site on the same night and had the opportunity to view the scene before the car was removed. He observed the location and had measurements taken of the skid marks on the roadway, the various gouges where the vehicle had struck the ground and the locations where both the vehicle and Tucker-Turney's body finally came to rest in relation to the road. On the basis of his measurements and observations at the scene and his training and experience in accident reconstruction, Trooper Sparling prepared a video simulation of the vehicle and occupant movements as the car went into a sideways skid (referred to as a yaw), left the roadway, rolled one-and-a-half times and came to rest on its roof. Based upon his analysis, which he found corroborated by the defendant's injuries and the location of his blood on the driver's side and front dashboard area of the vehicle, Trooper Sparling concluded that the defendant was driving at the time of the accident and Tucker-Turney had been thrown from the passenger side through the passenger side window. He rejected the possibility that Tucker-Turney could have been thrown from the driver's seat because the car had rolled first on the driver's side and, if the ground had not blocked her exit,

4

the car would have rolled over her. By the time the driver's side window came around again to a position where Tucker-Turney could have been expelled to the place where her body was found, Trooper Sparling concluded it would have lost the speed and force needed to throw her body the distance it covered. Trooper Sparling also noted that it is more common for the passenger to be thrown from the vehicle since the driver has hold of the steering wheel, which also operates as an obstacle to expulsion.

Dennis Skogen, a professional engineer retained by the defense, disagreed with Trooper Sparling's conclusion. While he agreed that it was possible for a person to be thrown from a vehicle through the passenger seat window as Sparling explained, he found it far more likely that in this case, Tucker-Turney had been thrown from the driver's seat through the driver's side window. Skogen based his opinion that Tucker-Turney was driving primarily upon the respective positions of the driver's and passenger's seats in relation to the size of Tucker-Turney and the defendant. When first examined and photographed by law enforcement, the driver's seat was set forward almost as far as it would go, and the passenger seat was set back. (See Ex. 1007.) Given their respective heights (5 feet, eleven inches, for the defendant and 5 feet, 1 inch for Tucker-Turney), Skogen concluded that it was far more likely that Tucker-Turney was driving at the time of the accident. Skogen also found it noteworthy that Trooper Sparling had not even addressed the location of the seats in his report. Although after seeing Skogen's report, Trooper Sparling, who was about the same size as the defendant, had himself photographed in the driver's seat to demonstrate it was possible for the defendant to have driven with the seat in that position, Skogen nevertheless concluded it was highly unlikely he would have willingly done so. Skogen disagreed

5

with Trooper Sparling's view that seat position was a subjective factor that was entitled to little weight in determining the identity of the driver.

As for the injuries to the defendant and locations in the car where his blood was found, Skogen testified that they were more consistent with the defendant being in the passenger seat at the time of the accident. In Skogen's view, damage to and dirt accumulated in the left front undercarriage of the vehicle meant that the initial force would have been to the front left. With no passenger side airbag, Skogen concluded the passenger was more likely to strike the windshield in the location where some of the defendant's blood was found, and since he remained in the car when it was rolling over, it was not surprising that his blood was found in other locations. Based on his own analysis, Skogen concluded that Tucker-Turney had been the driver.

This, in summary form, is the evidence the jury heard over two days. After listening to the closing arguments of the attorneys, the jury deliberated more than four hours before returning with a verdict of guilty. Given the evidence presented, it would not have been surprising for the jury to have returned a not guilty verdict. But that, of course, is not the test. The test is whether any rational jury could have found the defendant guilty of involuntary manslaughter beyond a reasonable doubt. *United States v. Henningsen*, 387 F.3d 585, 589 (7th Cir. 2004). The evidence presented meets this test.

It is clear from its verdict that the jury found Trooper Sparling's account of the accident more credible than Mr. Skogen's and that it disbelieved the testimony of Kimberly Waukechon and Jake Roulliard. In so finding, the jury acted well within its prerogative. It is uniquely the role of the jury to determine the credibility of witnesses, including expert witnesses, and to give to the testimony of each witness such weight as they conclude it deserves. Seventh Circuit Pattern

6

Criminal Jury Instructions 3.07 (1999). Having concluded that Trooper Sparling's account of the accident was the true account and that Waukechon and Roulliard were not credible, the jury had a sufficient basis upon which to base a verdict of guilty as to the defendant. Add to this the defendant's statements that he had killed her, his hesitation before identifying Tucker-Turney as the driver when directly asked by law enforcement, and the testimony of Miller and Wayka that they had seen the defendant driving the vehicle shortly before the accident, I cannot say that the evidence is insufficient to sustain the verdict. Given the evidence presented, it would be improper for this court to substitute another view of the evidence for that of the jury. It is for this reason that I conclude defendant's Rule 29 motion for judgment of acquittal must be denied.

    **SO ORDERED** this   11th   day of July, 2006.


                              s/ William C. Griesbach
                              William C. Griesbach
                              United States District Judge