UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.　　　　　　　　　　　　　　　　　　　　　　　　Case No. 05-CR-280

GERALD T. SMITH,

    Defendant.

**ORDER GRANTING MOTION FOR A NEW TRIAL**

    This case is before me on the defendant's motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. Defendant Gerald T. Smith was charged in a one-count indictment with involuntary manslaughter contrary to 18 U.S.C. § 1112. More specifically, he was alleged to have caused the death of Diane Tucker-Turney, a Native American Indian, when he lost control of the vehicle he was driving while under the influence of an intoxicant and crashed on the Menominee Indian Reservation. Tucker-Turney was killed when she was thrown from the vehicle after it left the roadway in a sideways skid, made at least one complete roll, and came to rest on its roof. The sole factual issue in the case was who was driving at the time of the accident? The government claimed it was Smith, while the defense argued that Tucker-Turney was the driver. Both were severely intoxicated at the time. At the close of the two-and-a-half day trial, a jury returned a verdict finding Smith guilty. The court has already denied Smith's Rule 29 motion for judgment of acquittal notwithstanding the verdict both orally and in writing, and Smith has now filed a timely motion for a new trial. For the reasons that follow, Smith's request for a new trial will be granted.

## I. Standard of Review

Rule 33 of the Federal Rules of Criminal Procedure states that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). As noted above, the court has previously denied Smith's Rule 29 motion for judgment of acquittal notwithstanding the verdict. In deciding a motion for judgment of acquittal under Rule 29, the court is required to "approach the evidence from the standpoint most favorable to the government, and to assume the truth of the evidence offered by the prosecution. If on this basis there is substantial evidence justifying an inference of guilt, the motion for acquittal must be denied." Wright, King & Klein, *Federal Practice and Procedure: Criminal* 3d § 553, p.466-67 (2004). In deciding a motion for a new trial, however, the review of the court is much broader. *Id.* On a motion for a new trial, "the court may reweigh the evidence, taking into account the credibility of the witnesses." *United States v. Washington*, 184 F.3d 653, 658 (7th Cir. 1999). Of course, it is quintessentially the role of the jury to determine the credibility of witnesses and the weight of the testimony. "It is axiomatic that, absent exceptional circumstances, issues of witness credibility are to be decided by the jury, not the trial judge." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989). But "[i]f the complete record, testimonial and physical, leaves a strong doubt as to defendant's guilt, even though not so strong a doubt as to require a judgment of acquittal, the district judge may be obliged to grant a new trial." *United States v. Morales*, 902 F.2d 604, 608 (7th Cir. 1990). After careful consideration of the evidence, I conclude that this is such a case.

## II. The Evidence

The only living eyewitness to the accident itself was Smith himself, who exercised his constitutional right not to testify. Smith's failure to give his own account of the accident, to the

2

extent he retained any memory of it, is of course not evidence and raises no inference of guilt. *See Griffin v. California*, 380 U.S. 609, 614 (1965) (the trial court's and the prosecutor's comments on the defendant's failure to testify violates the Self-Incrimination Clause of the Fifth Amendment). As a result, the only evidence that was offered consisted of the testimony of those that had seen Smith and Tucker-Turney shortly before the accident, those that came on the scene after the accident, and the testimony of the experts who later examined and analyzed the physical evidence of the crash.

The accident occurred on August 2, 2004, sometime (it is not clear exactly when) between 6:30 p.m. and 7:00 p.m. south of the Village of Neopit on Highway 47. Several witnesses had seen Smith and Tucker-Turney in the vehicle involved in the crash earlier that day. Kevine Miller, who knew Tucker-Turney as the mother of her niece, testified that she had seen the two of them seated in their car in the parking lot at her mother's store in Neopit between approximately 4:30 and 5:00 p.m. According to Miller, Smith was sitting in the driver's seat, someone she did not recognize was in the passenger seat, and Tucker-Turney was in the back seat. About 40 to 45 minutes later, Miller again saw the vehicle now traveling south on Highway 47 but still in Neopit with Smith still in the driver's seat and Tucker-Turney now in the passenger seat. No one else was in the car.

Eva Wilbur, an elderly woman who had known Smith his entire life, also testified that she saw Smith seated in a car in the parking lot of Miller's store in Neopit in the late afternoon or early evening of August 2, 2004. When she saw him, however, Smith was seated in the passenger seat of the vehicle. Wilbur is unsure who was in the driver's seat, but she remembered seeing Smith and exchanging greetings with him because sometime after she returned home, her adopted grandson Justin Wilbur, who came on the scene after the crash, arrived home and reported what he had seen.

3

Because Miller and Eva Wilbur made their observations sometime before the accident while the car was still in Neopit and they each testified that a different person was driving (or at least seated in the driver's seat), their testimony is of little help in determining who the driver was at the time of the accident. There were several other witnesses, however, who saw the car in which Smith and Tucker-Turney were riding only moments before the accident. Marvin Wayka, Kim Waukechon, and Jake Rouillard were among the five passengers in a car that passed Smith and Tucker-Turney on Highway 47 south of Neopit at approximately 6:40 p.m. only moments before the accident presumably occurred. They were on their way to a movie theater in Shawano when they saw the car in which Smith and Tucker-Turney were riding swerving on the road in front of them. Waukechon and Rouillard, who were seated on the passenger side closest to the other vehicle as they passed, both testified that they saw a woman driving the other car. Waukechon, who knew both Smith and Tucker-Turney, positively identified Tucker-Turney as the driver and Smith as the passenger. Rouillard, who was new to the area and knew neither of them, said he saw a female driving and a male who looked "passed out" in the passenger seat.

Marvin Wayka, on the other hand, who was one of four passengers in the back seat and seated furthest away behind the driver of the passing car, testified initially that it was Smith that was driving. He later testified on cross-examination that Tucker-Turney was the driver and on re-direct changed again to Smith. Wayka's previous out-of-court statements had been likewise contradictory. He initially told police investigators and testified before the grand jury that Smith was the driver. As trial approached, however, he told both Smith's attorney and an FBI Special Agent that Tucker-Turney was the driver. Finally, at trial he admitted he felt "torn" over the matter, and altered his answer depending upon the identity of the questioner.

4

The post-accident witnesses consisted of both citizens who came on the scene immediately after the crash and several law enforcement officers who were dispatched to the scene shortly thereafter. Justin Wilbur, Eva's adopted grandson, was also on his way to Shawano and pulled over when he saw the gravel on the roadway. He found the car with its wheels still spinning off to the side of the road laying on its roof. Smith was on his back in the back of the car with his head toward the driver's side and his feet in between the front seats. Wilbur helped Smith out of the driver's side window and noted that he was bleeding. James Waukau, who also arrived at the scene shortly after the accident, testified that he saw Smith holding his head, which was bleeding. He heard someone ask Smith "Where's Auntie Di?", meaning Tucker-Turney, and heard Smith reply that she was in the car and had been driving. Waukau looked for her in the car but instead found her body where it had been thrown some 126 feet away. Waukau testified that Smith appeared distraught and he heard him crying after Tucker-Turney's body was located. Ralph Boettcher, on the other hand, who at the time was an off-duty Tribal law enforcement officer, testified that he was flagged down by a pedestrian at the accident scene. He saw Smith, who was a former Menominee Tribal Police officer, standing over Tucker-Turney's body looking distraught, intoxicated, crying and bleeding from the head. Boettcher testified that he heard Smith say "I'm sorry – I did it – I killed her."

Menominee Tribal Police Officer Richard Irving and Menominee County Sheriff Deputy Louis Moses arrived at about 7:00 p.m. Both observed Smith standing over Tucker-Turney's body and testified that when they asked him who was driving, he paused a few seconds, and then pointed at Tucker-Turney's body and said "she was." Deputy Moses also testified that Smith was bleeding profusely but declined medical treatment, stating he needed to get up to his camp at Bass Lake

5

Case 1:05-cr-00280-WCG   Filed 09/19/06   Page 5 of 15   Document 48

because he had fish to clean. When Tribal Officer Irving advised Smith that he would be taken into custody, Smith stated, "You gotta do what you gotta do," but claimed he was not the driver. Later at the hospital where Smith was brought for medical treatment, Officer Irving heard him make various statements to family members, including "I was taught to kill, but not like this," that he had to drag Diane's body out of the car, that he found her body 20 or 30 feet from the car, and that he did not know what had happened.

In the course of the investigation, DNA analysis was performed on blood stains found in various locations inside the vehicle. The parties stipulated to the results of the analysis which showed Smith to be the source of all of the blood in which DNA was detected.[1] At trial, the government called Detective Robert Haglund of the Green Bay Police Department to testify as an expert on blood stain analysis. *See, generally,* Danny R. Veilleux, Annotation, *Admissibility, in Criminal Prosecution, of Expert Opinion Evidence as to "Blood Splatter" Interpretation*, 9 A.L.R.5th 369 (1993). Detective Haglund, who had performed crime scene analysis as a detective with the Green Bay Police Department for fourteen years, in addition to basic training on the subject prior to becoming a police officer, had attended several training sessions on basic blood pattern analysis throughout his career. In 1998, he attended the Midwestern Association of Forensic Scientists Bloodspatter Workshop, a forty-hour training session put on by two authorities in blood spatter analysis. The workshop involved both the creation of the participant's own patterns and the analysis and interpretation of known blood patterns created by others under the supervision and direction of the instructors. Haglund testified that he had conducted blood stain analysis in over a

---

[1] As to the blood found on the driver's side top edge safety belt holder, more than one source of male DNA was detected. Smith was found to be the major source and a minor contributor was inconclusive. (Ex. 51, at 4.) No significance was attached to this finding by either party.

6

hundred cases, done in-service training for his department and testified as an expert in state court on four occasions. Based on his training and experience, Detective Haglund had become a member of the International Association of Bloodstain Analysts.

Detective Haglund conceded, however, that he had received no formal education in the principles of physics or mathematical formulas that are applicable to blood spatter analysis, and that none of his training or experience involved analyzing blood stains in roll-over accidents in which both the blood and the surrounding environment were moving rapidly. Despite these limitations, Detective Haglund was permitted to testify over the defendant's objection as to the direction from which several blood stains found on the interior of the vehicle appeared to have come. In this regard, Detective Haglund testified that several of the stains he examined appeared to have come from the direction of the driver's seat area.[2] Haglund also opined based on the appearance and size of the stains that the pattern on the dash was produced by blood moving at a medium velocity. He was unable to say, however, when during the sequence of events the blood was deposited in the various locations it was found.

Both the prosecution and defense also presented testimony from accident reconstruction experts. Wisconsin State Trooper Larry Sparling, who had been called out to the scene on the night of the accident, testified on behalf of the prosecution. Based upon his consideration of the evidence, including the scene, the car itself, the location of Tucker-Turney's body, the location of Smith's blood within the vehicle, and his own calculations, Trooper Sparling concluded that Smith was the

---

[2] I note that defendant's own expert was in agreement with Detective Haglund's opinion concerning the direction from which the blood spatter on the passenger-side dashboard had come. See March 21, 2006 Report of Dennis Skogen, Ex. 1005, at 5 ("... Smith[ ] is the likely source of the blood found ... on the dash with the dash splatter that appear to originate from the driver's side.").

7

driver. From his examination of the scene and the final resting place of the car, Trooper Sparling concluded that the passenger side tires had first left the roadway onto the gravel shoulder. The driver steered back onto the roadway but went too far to the left. The driver then overcorrected back to the right, which caused the car to go into a yaw, or sideways skid. The driver lost control, and the car skidded sideways off the roadway onto the shoulder, where the buildup of gravel and dirt caused the car to roll with the driver's side leading. Based on his examination of the gouge marks in the ground along the path the vehicle had traveled and the final resting spot of the car and Tucker-Turney's body, Trooper Sparling concluded that the car had rolled 1 ½ times and that Tucker-Turney had been ejected from the passenger seat on the initial roll of the car. Trooper Sparling based his opinion on the final resting place where Tucker-Turney's body was found and the speed the car would have had to be moving in order to throw the body such a distance. After the first half-rotation, he concluded the vehicle would not have had sufficient speed to generate the force needed to propel the body such a distance. Based upon his analysis, which he found corroborated by the defendant's injuries and the location of his blood on the driver's side and front dashboard area of the vehicle, Trooper Sparling concluded that the defendant was driving at the time of the accident and Tucker-Turney had been thrown from the passenger side through the passenger side window. He also noted that it is more common for the passenger to be thrown from the vehicle since the driver has hold of the steering wheel, which also operates as an obstacle to expulsion.

The accident reconstruction expert for the defense was Dennis Skogen, a professional engineer with thirty-six years of experience in accident reconstruction and other consulting work. Although he had not been to the scene of the accident, Skogen reviewed the photographs of the scene and all the other physical evidence that had been gathered. Based upon his review of the file

8

and his own training and experience, Skogen concluded that, while it was possible she was thrown from the passenger seat as Trooper Sparling had opined, it was more probable that Tucker-Turney and not Smith had been the driver and that she was thrown through the driver's window either on the first ¾ roll or on the 1 ¾ roll.[3] Skogen rejected Trooper Sparling's conclusion that the vehicle's speed was not sufficient to generate the force needed to throw Tucker-Turney's body to its final resting spot after the first half-roll. According to his calculations, her body could have ended up at the same spot if she had been thrown from the car later in the sequence. Skogen also found the location of Smith's blood within the vehicle of little assistance in deciding who was driving. Because Smith had suffered a laceration and remained unrestrained in the vehicle as it left the roadway and rolled over at least 1 ½ times, Skogen thought it was not surprising that Smith had deposited blood in various places and from various locations within the vehicle during the crash.

Having found both the speed and force calculations and the blood stain evidence inconclusive on the question of who was driving, Skogen turned to a factor that Trooper Sparling had failed to even address in his initial report – the respective positions of the driver and passenger seats. The photographs depicting the seat positions after the accident showed the driver's seat to be in a forward position, perhaps all the way forward, suggesting that the driver was of small stature. The passenger seat, on the other hand, was positioned further back, allowing for more leg room. (Exs. 1006, 1007.) Given their respective sizes (Smith was 5'11" and 220 pounds; Tucker-Turney was 5'1" and 140 pounds), Skogen concluded that it was much more likely that the shorter Tucker-Turney was the driver.

---

[3]Contrary to Trooper Sparling, Skogen believed the car may have rolled 2 ½ times instead of only 1 ½ times.

This, in sum, was the evidence that was presented to the jury. Although I have concluded that it is sufficient to withstand a motion for judgment of acquittal, I nevertheless conclude for the reasons that now follow that, taken as a whole, it leaves a strong doubt as to the defendant's guilt and thus a new trial is appropriate.

### III. Discussion

The evidence that has given the court the most difficulty in this case concerns the location of the seats, particularly the driver's seat, at the time of the accident, and the eyewitness testimony of Kim Waukechon and Jake Rouillard concerning who was driving. The position of the driver's seat and the front passenger seat strongly suggest that Tucker-Turney was the driver and Smith the passenger. The driver's seat was so far forward that it would have been difficult for Smith to have driven the vehicle with the seat in that location. The front passenger seat, on the other hand, was pushed back to a position that would have allowed room for Smith's longer legs. The mechanisms for moving the seats forward and backwards were working properly, and there was no evidence, or even the suggestion, that the seat positions had been changed after the accident. Justin Wilbur, who appears to have arrived first, was to the court's recollection not asked if he moved the seat while assisting Smith exit the upside down vehicle, and Smith, given his degree of intoxication and the head injury he sustained, seems unlikely to have intentionally changed the seat positions so as to make it appear he was not the driver.

Despite these facts, Trooper Sparling testified that he had given seat position little weight in his analysis because it is a somewhat subjective factor that is dependent upon personal taste and other circumstances. He gave as an example his own reluctance to change the seat position in his wife's car when he went on short errands. But while Trooper Sparling may be correct that slight

10

discomfort may not motivate someone to alter the driver's seat position of another person's vehicle, the position of the driver's seat here would have resulted in more than slight discomfort. In addition, there is no evidence as to who the normal driver of the car was. The fact that Smith was intoxicated may, as the government argued, explain his willingness to drive with the seat in such an awkward position, but changing seat positions does not require great dexterity or sobriety. I therefore find this fact significant.

The location of the driver's seat offers a further problem for the government's theory of the case. Trooper Sparling opined that injury to the right side of Smith's head most likely occurred when he struck his head on the driver's side safety belt holder located on the B-pillar. But Skogen claimed, and at least one of the photographs (Ex. 30) suggests, that the seat was moved so far forward that the B-pillar and seat belt hanger were behind the seat, making it unlikely, if not impossible, that the injury to Smith's head could have been caused and the "contact" blood stain left in the manner Trooper Sparling described.[4] Defendant argues that it is far more likely his blood was deposited in the location of the safety belt clip as he was exiting the vehicle after the crash. This issue, too, was not sufficiently addressed.

---

[4] Skogen also testified, and Smith argues, that it would be contrary to physics for Smith's head to strike the seat belt clip behind him on the initial roll of the vehicle because the force was to the front left, not the back left. (Def.'s Br. at 29.) In light of Trooper Sparling's description of passenger kinematics, however, I do not find this aspect of the defendant's argument convincing. The vehicle was moving in a sideways orientation when it left the roadway. The fact that the front left of the vehicle impacted the ground first would not have caused the passengers to move in that direction. They would have continued moving in the same direction while the front of the vehicle would have abruptly slowed while the rear continued, causing the vehicle to slightly rotate. It appears to the court that this would most likely cause the driver to strike the interior of the vehicle further to the rear of his or her original position just as Trooper Sparling opined.

11

The other evidence that is difficult to reconcile with the jury's verdict was the testimony of Jake Rouillard and Kim Waukechon. Waukechon testified unequivocally that Tucker-Turney and not Smith was driving the vehicle when the car in which she was riding passed it as it was swerving down the highway apparently moments before the accident. The government challenged Waukechon's credibility based on the fact she did not contact police either before or immediately after the accident and report who was driving. But many citizens do not call police on their cell phones to report drunk drivers, and there is no evidence Waukechon had any reason to believe police were in doubt as to the identity of the driver after the accident occurred before she found out Smith was being charged with causing Tucker-Turney's death. It was at that point that she contacted the police.

The government also argued that Waukechon wanted to help Smith because she had been friends with Smith's daughter who was killed in a motor vehicle accident in 1995 and she knew of other tragedies in his life. But while the loss of loved ones may have caused Waukechon to feel sympathy and even lie for Smith, it does not appear a particularly strong reason to commit perjury. And of course, it does not explain why Rouillard, who was also clear in his testimony that the driver was a female, would lie for someone he did not even know. Rouillard, remember, was new to the Menominee Reservation and did not know either Smith or Tucker-Turney. The government argued to the jury that Waukechon had enlisted Rouillard to lie for Smith, but little was offered to support such a contention. Rouillard did not even recall Waukechon's name when he was asked to identify the people with whom he went to the movies that night. There was no evidence of any ongoing relation between them. In support of its argument that Waukechon was directing Rouillard, the government pointed to Waukechon's initial statement to the police in which she apparently claimed

12

that "we all saw Tucker-Turney driving." But the use of such an expression may simply reflect the assumption on her part that everyone in the car saw what she had seen, as opposed to what the government viewed as an effort to fabricate evidence or orchestrate Smith's defense. Likewise, the minor inconsistency the government points to between Waukechon and Rouillard as to whether the woman driver continually stared straight ahead or glanced at them as they passed is not sufficient, by itself, to cast significant doubt on their testimony.

In contrast to the clear, consistent and unambiguous testimony of Waukechon and Rouillard, the government offers the shifting versions offered by Marvin Wayka as a more credible account of who was driving. It argues that the fact that Wayka felt "torn" and pressured to say that Smith was not the driver indicates that he was telling the truth when, despite that pressure, he testified that Smith was driving. But Wayka also felt pressure to say Smith was the driver. Otherwise, he would have consistently testified that he was not. The government's argument assumes that the only possible reason Wayka could have had for saying Smith was the driver was that it was true. That may be the case, although Wayka's allegiance to the truth was not apparent as he shifted from one version to the other on direct, cross, and then re-direct examination. On the other hand, it could also be that having initially claimed Smith was driving, Wayka felt he could not change his story, even if in doubt, without facing possible charges for obstructing or perjury. In any event, given his position in the passing car, Wayka was in the least favorable position to view the driver. And regardless of whether Wayka's testimony told us anything about who was driving, it revealed one irrefutable fact about him: Marvin Wayka is willing to lie under oath. His is hardly the kind of testimony upon which a verdict of guilty can comfortably rest.

13

The testimony of the post-accident witnesses was similarly conflicting and inconclusive. The statements attributed to Smith by Boettcher, an off-duty officer who apparently knew Smith and may have worked with him, were undercut by those recounted by James Waukau, who only knew of him. Boettcher recounted a statement or statements in which Smith acknowledged his own responsibility for Tucker-Turney's death, whereas Waukau's account suggests he thought she was driving. And Smith's statements to the responding officers and then later to his family and friends at the hospital, to the extent coherent, are hopelessly irreconcilable and inconsistent, which given the degree of his intoxication, the blow to his head and the death of his companion, is not surprising. Unfortunately, it also makes them deserving of little, if any, weight.

All of which leaves us with the accident reconstruction experts. None of the foregoing evidence, it should be noted, including the position of the driver's seat, conclusively demonstrates that Smith was not driving. Given the tendency of this evidence to suggest that Smith was not the driver, however, the court is convinced that a more thorough presentation of the accident reconstruction analysis is necessary in order to assure that a miscarriage of justice has not occurred. Because the testimony of the lay witnesses was either too weak to support the government's theory of the case, or flatly contradicted it, a more detailed and thorough analysis of the physical evidence is necessary if a verdict of guilty is to be sustained. The principles of physics and the mathematical calculations based upon those principles to which Trooper Sparling alluded in his testimony may well be sufficient to overcome the difficulties presented by the eyewitnesses in the passing car and the position of the driver's seat. But given Mr. Skogen's testimony disputing the application of those principles to the facts of this case and his alternative theory in which Tucker-Turney was thrown from the driver's side, merely alluding to the principles and calculations is not sufficient to

14

refute the manifest weight of the evidence that Smith was not driving. In short, to overcome the evidence that Smith was not driving, the government must make a more convincing showing that Skogen's alternative theory that Tucker-Turney was ejected from the driver's seat on a later rotation of the vehicle is deficient.[5]

## IV. Conclusion

Since Skogen's alternative theory was not sufficiently addressed by the evidence, and in light of the other evidence in the case suggesting that Smith was not the driver, I conclude that the verdict reached in this case was contrary to the manifest weight of the evidence and a new trial should be granted in the interests of justice. The defendant's motion is therefore granted, and the judgment of conviction previously entered is vacated. The clerk is directed to set this matter on the court's calendar for further proceedings.

**SO ORDERED** this   19th   day of September, 2006.

     s/ William C. Griesbach
     William C. Griesbach
     United States District Judge

---

[5] This is not intended as a criticism of the government's case or counsel. To the contrary, the court commends counsel for both sides for an excellent presentation of the evidence, as well as their cooperation with each other in presenting the case to the jury. But what I now conclude was needed in this case, given the evidence in support of Smith's claim that he was not the driver, was more detail and specificity than would normally be expected.